IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.

ALFRED BARNES,
GREGORY DIXON,
RALPH HILL,
VINCENT JOHNSON,
ALAN MOORE,
and
E. LAVON SPENCE

_____/

INDICTMENT

4:06cr36/RH

THE GRAND JURY CHARGES:

COUNT ONE
(CONSPIRACY)

A. Introduction

At all times material to this Indictment:

1.   The Federal Correctional Institution in Tallahassee (FCI Tallahassee) was a secure federal correctional facility housing female inmates, who were held in custody by direction of the Attorney General. The custody of these female inmates required that they be supervised 24 hours per day, seven days per week. FCI Tallahassee was part of the Department of Justice, Federal Bureau of Prisons (BOP).

Returned in open court pursuant to Rule 6(f)

_____
Date

_____
United States Magistrate Judge

2. FCI Tallahassee consisted of several single and multi-story brick buildings within a fenced, secure compound, lodging prisoners in either double rooms or dormitory style housing. FCI Tallahassee also had a Special Housing Unit (SHU), which provided cells to house prisoners who required segregation from the main female population for various reasons.

3. The custody of inmates at FCI Tallahassee was maintained pursuant to federal laws, BOP regulations, and rules and regulations promulgated by the warden of FCI Tallahassee. These laws, rules and regulations included, but were not limited to:

    a. Title 18, United States Code, section 1791(a)(1), which prohibited the provision of contraband to an inmate in prison, which included a federal correctional facility such as FCI Tallahassee. Contraband included marijuana, alcoholic beverages, United States currency, or any other object that threatened the order, discipline, or security of a prison. BOP regulations and orders issued by the Warden of FCI Tallahassee defined what other objects were prohibited for inmates to possess within FCI Tallahassee;

    b. Title 18, United States Code, Section 2243(b), which prohibited anyone with custodial, supervisory, or disciplinary authority over a person in official detention from engaging in a sexual act with that person in official detention, whether or not the sexual act was consensual;

    c. Regulations and orders issued by the Bureau of Prison under the authority of Warden of FCI Tallahassee included:

        i. Employees may not allow themselves to show partiality toward, or become emotionally, physically, sexually, or financially involved with

2

inmates, former inmates, or the families of inmates or former inmates.

    ii.    The introduction of contraband into or upon the grounds of any federal penal or correctional institution, or taking or attempting to take therefrom, anything whatsoever without the Warden's knowledge and consent, was prohibited. Pursuant to 28 Code of Federal Regulations § 500.1(h) and BOP Rules and Regulations, contraband was defined to include, but was not limited to, money, food, messages, alcoholic beverages, and items not obtained from the commissary.

    iii.    Employees of the Bureau of Prisons had access to official information ranging from personal data concerning staff and inmates to information involving security. Because of the varying degrees of sensitivity of such information, that information could be disclosed or released only as required in the performance of an employee's duties or upon specific authorization from someone with the authority to release official information.

    iv.    Every employee was required to report to management immediately any violation or attempted violation of any law or regulation and any act or omission by any person which could result in a breach of institution security.

4.    Correctional Officers were assigned to shifts to supervise inmates at FCI Tallahassee. These shifts were generally eight hours long and were scheduled to ensure the appropriate supervision of inmates, 24 hours each day, every day of the year. In addition to the

regularly assigned shifts, there were relief shifts designed to cover scheduled and unanticipated absences among the CO staff.

5. Correctional Officers were assigned to various locations. During each shift there were Correctional Officers assigned to housing units, interior and exterior patrol of the institution, and other assignments throughout the institution as determined by supervisory personnel.

6. Correctional Officers were given the opportunity to place "bids" or requests for their preferred shift and location, according to seniority and BOP regulations. Following the bid process, a work schedule was prepared, which identified which location and time each Correctional Officer will work for the upcoming quarter. Correctional Officers could, however, change assignment times or locations by arranging the change directly with another Correctional Officer and conferring with supervisory BOP staff. Each change of working assignment was noted by supervisory staff in the daily log.

7. As part of their standard duties on each shift, Correctional Officers were encouraged to monitor, on a random basis, inmate telephone calls. The purpose of this phone monitoring was to ensure that inmates were not using the prison telephone system to conduct illegal activities while they are in prison.

8. As part of their duties, Correctional Officers also had access to BOP computer systems that provide confidential information concerning the inmates assigned to the BOP. The access, use, and dissemination of this information was regulated by BOP policies and procedures.

9. As part of their duties, Correctional Officers also had access to a telephone in their offices within the respective units. Access and use of these telephones was regulated by

BOP policies and procedures.

10. Currency was a prohibited item in FCI Tallahassee, and inmates were not permitted to possess any cash. Rather, inmates maintain a prison account into which their friends or family could deposit money, and into which the salary from their prison jobs was deposited. From this account, the inmates could purchase items from the FCI Commissary. These items include selected cosmetics, clothing, and food as approved by the BOP.

11. **ALFRED BARNES, GREGORY DIXON, RALPH HILL, VINCENT JOHNSON, ALAN MOORE,** and **E. LAVON SPENCE** were Correctional Officers employed by BOP, and assigned to the FCI Tallahassee, with custodial, supervisory, and disciplinary authority over inmates imprisoned at FCI Tallahassee.

12. As an employee of the BOP, each of the above named Correctional Officers had authority over inmates granted by the BOP that facilitated their assignments and duties, including the authority to conduct a search of inmates, to monitor inmate telephone calls, to report suspected violations of BOP rules and regulations, and to seize contraband from inmates.

13. As an employee of the BOP, each of the above named Correctional Officers had the ability to enter FCI Tallahassee without being subjected to the search of their person or containers in their possession, and the ability to access certain restricted locations within FCI Tallahassee, in furtherance of their duties.

14. As an employee of BOP, each Correctional Officer also had the ability to request specific work assignments, and the ability to switch work assignments with other BOP employees.

5

15. Correctional Officers owed a duty to provide honest services to the public and to act in the public's best interest.

## B. The Agreement

That from in or about March of 2002, through on or about the date of this Indictment, in the Northern District of Florida and elsewhere, the defendants,

**ALFRED BARNES,
GREGORY DIXON,
RALPH HILL,
VINCENT JOHNSON,
ALAN MOORE,
and
E. LAVON SPENCE,**

did knowingly and willfully conspire, combine, confederate, and agree together and with other persons, to commit offenses against the United States and to defraud the United States, or any agency thereof, namely:

(1) as public officials, directly and indirectly, to corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally and for any other person, in return for being induced to do an act and omit to do an act in violation of the official duty of a Correctional Officer, in violation of Title 18, United States Code, Section 201(b)(2).

(2) to execute and attempt to execute a scheme to fraudulently deprive another of the intangible right of honest services and for the purpose of executing such scheme to cause matters to be delivered by the United States Postal Service, in violation of Title 18, United States Code, Sections 1341 and 1346;

(3) to knowingly intimidate, threaten, and corruptly persuade another person and attempt to do, with the intent to hinder, delay, and prevent the communication to a law

enforcement officer of information relating to the commission or possible commission of a federal offense, in violation of Title 18, United States Code, Section 1512(b)(3);

(4) to knowingly use the mail and a facility in interstate commerce with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of a unlawful activity, that is, extortion, and thereafter performing, and attempting to perform, an act to promote, manage, establish, and carry on the extortion, in violation of Title 18, United States Code, Section 1952(a)(3);

### C. Manner and Means

The manner and means by which the conspiracy was carried out included the following:

16. It was part of the conspiracy that defendants would and did have sexual contact with inmates at FCI Tallahassee.

17. It was further part of the conspiracy that defendants would and did bring in contraband to FCI Tallahassee to sell and to use as payment in exchange for sexual contact.

18. It was further part of the conspiracy that defendants would and did bring in contraband to bribe inmates to keep silent about violations of law and prison regulations.

19. It was further part of the conspiracy that defendants would and did cause inmates, their family members, and associates to transmit monies in payment for contraband to defendants via mail, wire transmission, and hand delivery.

20. It was further part of the conspiracy that defendants would and did cause contraband to be secreted in various locations within FCI Tallahassee for collection by the inmates.

21. It was further part of the conspiracy that defendants would and did discourage inmates from reporting defendants' illegal conduct by threatening to plant contraband among the inmates' belongings.

22. It was further part of the conspiracy that defendants would and did coordinate among themselves and others to switch duty assignments and to undertake other actions to facilitate contact with inmates for illegal purposes.

23. It was further part of the conspiracy that defendants would and did monitor telephone calls of specific inmates for the purpose of intimidating and identifying inmates who were disclosing criminal conduct to other persons.

24. It was further part of the conspiracy that defendants would and did ask other Correctional Officers, including the defendants, and inmates, to speak with individuals suspected of cooperating with law enforcement investigators, in an attempt to persuade them not to cooperate.

25. It was further part of the conspiracy that defendants would and did discourage inmates from reporting defendants' illegal conduct by threatening to have inmates "shipped" to another BOP facility in a location farther from their families.

26. It was further part of the conspiracy that defendants would and did show inmates information concerning themselves and other inmates on BOP computers as proof that the inmates could be tracked anywhere within the BOP system.

27. It was further part of the conspiracy that defendants would and did use cleaning products to destroy evidence of their sexual contacts with inmates.

28.  It was further part of the conspiracy that defendants would and did use other inmates to act as a "lookout" to warn the defendants.

29.  It was further part of the conspiracy that the conspirators would and did perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

### D. Overt Acts

In furtherance of this conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed by the conspirators in the Northern District of Florida, and elsewhere:

30.  Between in or about September 2003 and in or about May 2005, ALFRED BARNES engaged in sexual contact with Inmate No. 5 in exchange for contraband.

31.  Between in or about September 2003 and in or about June 2005, ALAN MOORE allowed Inmate No. 1 to leave her assigned housing area in violation of BOP regulations for the purpose of engaging in sexual contact with ALFRED BARNES.

32.  Between in or about September 2003 and in or about June 2005, ALAN MOORE allowed Inmate No. 1 to enter secure areas of the FCI Tallahassee for the purpose of permitting her to engage in sexual contact with ALFRED BARNES.

33.  Between in or about September 2003 and in or about September 2005, E. LAVON SPENCE engaged in sexual contact with Inmate No. 4 in exchange for contraband.

34.  Between in or about September 2003 and in or about June 2005, ALFRED BARNES switched work assignments with GREGORY DIXON for the purpose of allowing DIXON to engage in sexual contact with inmates.

9

35. Between in or about September 2003 and in or about May 2005, GREGORY DIXON engaged in sexual contact with Inmate No. 5 in exchange for contraband.

36. Between in or about September 2003 and in or about June 2005, E. LAVON SPENCE gave contraband to Inmate No. 14.

37. Between in or about November 2003 and in or about May 2005, ALFRED BARNES engaged in sexual contact with Inmate No. 1.

38. Between in or about December 2003 and in or about September 2004, GREGORY DIXON engaged in sexual contact with Inmate No. 11 in exchange for contraband.

39. Between in or about March 2004 and in or about May 2005, ALAN MOORE provided contraband to Inmate No. 6.

40. Between in or about March 2004 and in or about May 2004, ALAN MOORE engaged in sexual contact with Inmate No. 5 in exchange for contraband.

41. Between in or about March 2004 and in or about May 2005, VINCENT JOHNSON demonstrated the BOP Inmate tracking system to Inmate No. 6.

42. Between in or about March 2004 and in or about February 2005, E. LAVON SPENCE engaged in sexual contact with Inmate No. 13.

43. Between in or about May 2004 and in or about September 2005, RALPH HILL engaged in sexual contact with Inmate No. 10 in exchange for contraband.

44. Between in or about September 2004 and in or about March 2005, ALFRED BARNES provided contraband to Inmate No. 7.

45. Between in or about September, 2004 and in or about March 2005, ALFRED BARNES gave contraband to Inmate No. 8.

46. Between in or about December 2004 and in or about March 2005, GREGORY DIXON engaged in sexual contact with Inmate No. 12 in exchange for contraband.

47. Between in or about December 2004 and in or about March 2005, GREGORY DIXON engaged in sexual contact with Inmate No. 1 in exchange for contraband.

48. On or about December 7, 2004, E. LAVON SPENCE switched unit assignments with another Correctional Officer to gain access to Inmate No. 13 and Inmate No. 14.

49. On or about December 14, 2004, E. LAVON SPENCE switched unit assignments with another Correctional Officer to gain access to Inmate No. 13 and Inmate No. 14.

50. Between in or about January 2005 and in or about August 2005, RALPH HILL engaged in sexual contact with Inmate No. 2 in exchange for contraband.

51. Between in or about January 2005 and in or about May 2006, ALFRED BARNES received money from Inmate No. 15 in exchange for contraband.

52. In or about February 2005, RALPH HILL directed Inmate No. 4 to tell E. LAVON SPENCE that HILL had received a complaint about SPENCE'S sexual advances to another inmate.

53. In or about February 2005, E. LAVON SPENCE accused Inmate No. 3 of revealing to others his sexual advances towards her.

54. Between in or about March 2005 and in or about September 2005, RALPH HILL engaged in sexual contact with Inmate No. 7 in exchange for contraband.

55. On or about March 14, 2005, ALFRED BARNES switched unit assignments with GREGORY DIXON.

56.     On or about April 26, 2005, ALFRED BARNES monitored a call made by Inmate No. 1 through the BOP telephone system.

57.     Between in or about May 2005 and in or about June 2005, RALPH HILL engaged in sexual contact with Inmate No. 9 in exchange for contraband.

58.     On or about June 27, 2005, RALPH HILL monitored a telephone call made by Inmate No. 2 through the BOP telephone system.

59.     On or about June 27, 2005 RALPH HILL used his debit card to purchase a $50 money order given to Inmate No. 10.

60.     On or about June 27, 2005 RALPH HILL used his debit card to purchase a $100 money order given to Inmate No. 2.

61.     On or about June 27, 2005 RALPH HILL used his debit card to purchase a $500 money order given to Inmate No. 9.

62.     On or about July 1, 2005, RALPH HILL monitored a telephone call made by Inmate No. 9 through the BOP telephone system.

63.     On or about July 3, 2005, RALPH HILL monitored a telephone call made by Inmate No. 10 through the BOP telephone system.

64.     Between in or about October 2005 and in or about December, 2005, VINCENT JOHNSON counseled Inmate No. 2 not to cooperate with law enforcement in the investigation of RALPH HILL.

65.     On or about November 18, 2005, ALFRED BARNES caused an undercover agent to mail a $600 money order to be used to purchase contraband.

66. On or about November 19, 2005, ALFRED BARNES called the cellular telephone of an undercover agent to discuss the delivery of contraband.

67. In or about December 2005, VINCENT JOHNSON passed a message to Inmate No. 1 on behalf of ALFRED BARNES.

68. On or about December 18, 2005, VINCENT JOHNSON demonstrated the tracking of certain inmates over the BOP computer systems to Inmate No. 1.

69. On or about March 18, 2006, GREGORY DIXON questioned Inmate No. 2 about her cooperation with law enforcement against RALPH HILL.

70. On or about May 6, 2006, ALFRED BARNES introduced a package of contraband items intended for Inmate No. 15 into FCI Tallahassee.

All in violation of Title 18, United States Code, Sections 371, 1349, and 1512(k).

A TRUE BILL:

REDACTED
FOREPERSON

6/20/06
DATE

GREGORY R. MILLER
United States Attorney

ROBERT O. DAVIS
Assistant United States Attorney